IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION


CARL E. PETTY,
      Plaintiff,

vs.                                            Case No. 3:09cv52/WS/EMT

MICHAEL J. ASTRUE,
Commissioner of the
Social Security Administration,
      Defendant.
_____/

## REPORT AND RECOMMENDATION

      This case has been referred to the undersigned magistrate judge under the authority of 28 U.S.C. § 636(b) and Local Rules 72.1(A), 72.2(D), and 72.3 of the Northern District of Florida pertaining to review of administrative determinations under the Social Security Act ("the Act") and related statutes, 42 U.S.C. § 401, *et seq*.  It is now before the court pursuant to 42 U.S.C. § 405(g) of the Act for review of a final determination of the Commissioner of Social Security ("the Commissioner") denying Plaintiff's application for disability insurance benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 401–34.[1]

      Upon review of the record before this court, it is the opinion of the undersigned that the Commissioner's findings of fact are supported by substantial evidence and his conclusions of law comport with proper legal principles; thus, the undersigned recommends that the decision of the Commissioner be affirmed.

_____

     [1] As discussed below, Plaintiff also applied for Supplemental Security Income ("SSI") benefits under Title XVI of the Act.  42 U.S.C. §§ 1381–83.  In prior proceedings the Commissioner concluded that Plaintiff has been disabled for purposes of Title XVI as of April 21, 1992.  That determination is not at issue in this appeal.

I.   PROCEDURAL HISTORY

The procedural history of Plaintiff's claims for benefits encompasses approximately twenty-five years.  Plaintiff filed applications for DIB and SSI on April 21, 1992, asserting disability since June 3, 1985 (*see* Tr. 141–44).[2]  Plaintiff's applications were denied initially and on reconsideration (*see* Tr. 145, 161).  Following a hearing, in a decision entered April 5, 1994, an administrative law judge ("ALJ") found that Plaintiff was not disabled (*see* Doc. 15 at 2; Doc. 21 at 1).  The Appeals Council ("AC") vacated the decision and remanded Plaintiff's case for further proceedings (*id.*).  On March 28, 1996, following a supplemental hearing, a second ALJ rendered a partially favorable decision, finding that Plaintiff was disabled beginning April 21, 1992, but not at any time prior (Tr. 956–65).  Because Plaintiff's date last insured was December 31, 1986, the ALJ found that Plaintiff was not eligible for benefits under Title II of the Act (Tr. 963-A).  The AC also vacated this decision and again remanded the matter for further proceedings (Tr. 977–78).

A third hearing was held.  In a decision dated December 14, 1998, an ALJ found that for purposes of DIB Plaintiff had not been disabled at any time prior to December 31, 1986, but that as of April 21, 1992, he had been disabled for purposes of SSI (Tr. 22).  The AC denied Plaintiff's request for review (Tr. 6–7), which decision Plaintiff appealed to this district court.  By order dated October 29, 2001, the court reversed the ALJ's decision on the ground the ALJ erred when he failed to find at step two of the sequential analysis that prior to December 31, 1986, Plaintiff had a severe mental impairment; the case was remanded to the Commissioner for further proceedings (*see* Tr. 1061).  After holding a hearing, a fourth ALJ issued an unfavorable decision dated March 5, 2003, in which he found that Plaintiff had not been disabled at any time through December 31, 1986 (Tr. 1153–61).  The AC vacated the decision and again remanded the case, directing the ALJ to clarify the exertional and non-exertional limitations Plaintiff had during the relevant period; evaluate whether Plaintiff had the residual functional capacity ("RFC") to return to his past relevant work;

_____

[2] All references to "Tr." refer to the transcript of Social Security Administration record filed on May 26, 2009 (Docs. 13, 14).

As the parties acknowledge, and the index and body of the administrative record reflect, the file is incomplete, as documents on Pages 28 through 61—as well as other documents without assigned page numbers in the index—apparently were not available for inclusion (*see* Doc. 15 at 1–2; Doc. 21 at 1; Tr. i–iii; 1, 3, 5B).  Neither party contends that any of the missing documents are disputed or are essential to disposition of the issues raised in the instant appeal, and the court agrees.

and obtain evidence from a vocational expert ("VE") to clarify the effect of the assessed limitations on Plaintiff's occupational base (Tr. 1175).  On May 25, 2006, following a fifth hearing held on May 10, 2005, an ALJ found Plaintiff had not been disabled at any time through December 31, 1986 (Tr. 1061–73).  On January 24, 2009, the AC denied Plaintiff's request for review (*see* Doc. 15 at 7; Doc. 21 at 3).  The ALJ's decision dated May 25, 2006, thus stands as the final decision of the Commissioner, now subject to review in this court.  Ingram v. Comm'r. of Soc. Sec. Admin., 496 F.3d 1253, 1262 (11th Cir. 2007); Falge v. Apfel, 150 F.3d 1320 (11th Cir. 1998).  This appeal followed.

II.     FINDINGS OF THE ALJ

In his May 25, 2006, decision, in which he adopted and incorporated by reference the narrative summaries and documentation contained in all four prior decisions but not any of the prior decisions' findings of fact or conclusions of law, the ALJ made the following findings:

1)      Plaintiff met the disability insured status requirements of the Act on June 3, 1985, his alleged onset date of disability, and he continued to meet them through December 31, 1986, his date last insured ("DLI").[3]

2)      Plaintiff has not engaged in substantial gainful activity since June 3, 1985.

3)      As of December 31, 1986, Plaintiff suffered from the severe impairments of anxiety disorder, post-traumatic stress disorder ("PTSD"), history of Graves' disease,[4] and hypertension.  Plaintiff did not, however, on that date have an impairment or combination of impairments, listed in or medically equal to one listed in Appendix 1, Subpart P, Regulations No. 4.

---

[3] To be eligible for DIB, a claimant must show he became disabled prior to the expiration of his insured status. *See* 20 C.F.R. §§ 404.130, 404.131; Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).  In this case, the time frame relevant to Plaintiff's claim for DIB is June 3, 1985 (alleged onset date) through December 31,1986 (DLI).  As noted, Plaintiff has been found disabled for purposes of SSI beginning April 21, 1992; the Veterans Affairs ("VA") pension he receives related to his military service, however—which was $2229.00 monthly at the time of the fifth administrative hearing—renders him financially ineligible to receive SSI benefits (*see* Tr. 1061; 1329; 1339).  *See also* 20 C.F.R. §§ 416.202, 416.1100.

The parties agree that the ultimate question to be decided in this case is whether, for purposes of DIB, Plaintiff was disabled on or before his DLI of December 31, 1986, and thus whether he is eligible to receive benefits under Title II of the Act (Tr. 1328–32; Doc. 15 at 8–9; Doc. 21 at 2, n.2).

[4] Graves' disease, an autoimmune disorder, is the most common cause of hyperthyroidism. The Merck Manual, 87, 93 (1999, 17th ed.).

4)    Plaintiff's allegations of pain and functional limitations are not, to the degree alleged, supported by the evidence.

5)    Plaintiff possessed, through December 31, 1986, the RFC to perform simple, task-oriented type work at the light exertional level with mild limitations in maintaining the activities of daily living; moderate limitations in maintaining concentration, persistence, or pace and in social interaction; and no evidence of episodes of decompensation.

6)    At the time of his alleged onset of disability on June 3, 1985, Plaintiff was thirty-six (36) years of age, which the Regulations define as a "younger person."

7)    Plaintiff has a high school education.

8)    At the time of his DLI on December 31, 1986, Plaintiff was unable to return to his past relevant work.

9)    In view of his exertional capacity for simple, unskilled light work (with certain additional non-exertional limitations) and his vocational profile, through his DLI on December 31, 1986, Plaintiff was capable of making an adjustment to other work which existed in significant numbers in the national and regional economies. According to the testimony of the VE, this work included the positions of janitor, laundry operator, and assembly worker.

10)   Plaintiff was not under a "disability," as defined in the Act, as amended, at any time through December 31, 1986, the date his insured status expired.

 (Tr. 1065; 1072–73).

## III.    STANDARD OF REVIEW

Review of the Commissioner's final decision is limited to determining whether the decision is supported by substantial evidence from the record and was a result of the application of proper legal standards.  Carnes v. Sullivan, 936 F.2d 1215, 1218 (11th Cir. 1991) ("[T]his Court may reverse the decision of the [Commissioner] only when convinced that it is not supported by substantial evidence or that proper legal standards were not applied."); *see also* Lewis v. Callahan, 125 F.3d 1436, 1439 (11th Cir. 1997); Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).  "A determination that is supported by substantial evidence may be meaningless . . . if it is coupled with or derived from faulty legal principles."  Boyd v. Heckler, 704 F.2d 1207, 1209 (11th Cir. 1983), *superseded by statute on other grounds as stated in* Elam v. R.R. Ret. Bd., 921 F.2d 1210, 1214

(11th Cir. 1991). As long as proper legal standards were applied, the Commissioner's decision will not be disturbed if in light of the record as a whole the decision appears to be supported by substantial evidence. 42 U.S.C. § 405(g); Falge, 150 F.3d at 1322; Lewis, 125 F.3d at 1439; Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995). Substantial evidence is more than a scintilla, but not a preponderance; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 59 S. Ct. 206, 217, 83 L. Ed. 126 (1938)); Lewis, 125 F.3d at 1439. The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Martin v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted). Even if the evidence preponderates against the Commissioner's decision, the decision must be affirmed if supported by substantial evidence. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).

The Act defines a disability as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To qualify as a disability the physical or mental impairment must be so severe that the claimant is not only unable to do his previous work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A).

Pursuant to 20 C.F.R. § 404.1520(a)–(g), the Commissioner analyzes a disability claim in five steps:

1.      If the claimant is performing substantial gainful activity, he is not disabled.

2.      If the claimant is not performing substantial gainful activity, his impairments must be severe before he can be found disabled.

3.      If the claimant is not performing substantial gainful activity and he has severe impairments that have lasted or are expected to last for a continuous period of at least twelve months, and if his impairments meet or medically equal the criteria of any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the claimant is presumed disabled without further inquiry.

4.      If the claimant's impairments do not prevent him from doing his past relevant work, he is not disabled.

5.      Even if the claimant's impairments prevent him from performing his past relevant work, if other work exists in significant numbers in the national economy that accommodates his residual functional capacity and vocational factors, he is not disabled.

The claimant bears the burden of establishing a severe impairment that keeps him from performing his past work.  20 C.F.R. § 404.1512.  If the claimant establishes such an impairment, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform.  MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, the claimant must then prove he cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

IV.     PLAINTIFF'S PERSONAL, EMPLOYMENT AND MEDICAL HISTORY[5]

A.      Personal and Employment History

Plaintiff was born on November 30, 1948 (Tr. 141), making him fifty-seven years of age at the time of the May 25, 2006, decision that is the subject of the instant appeal.  The record reflects that Plaintiff graduated from high school in 1966, then served in the United States Air Force from 1968 until 1972; his military service included duty in Vietnam (Tr. 100; 1012).  Plaintiff testified that after leaving the military he worked as a railroad trainman or apprentice engineer from 1972 to 1981 (Tr. 1334–37) and that in1984–85 he owned and operated a convenience store (Tr. 1338) (*see also* earnings report, Tr. 1100).[6]

---

[5]  At over 1350 pages, the administrative file in this case—which includes medical records dated as early as 1972—is extensive.  The court includes in its review and discussion only those records that are relevant to the questions raised in this appeal.  Thus, except as may be helpful to the resolution of Plaintiff's case, this summary does not include detailed records for impairments—or for periods of time—that are not directly at issue.

[6]  In 1991–92 Plaintiff also worked part time as a janitor (Tr. 1336–37).  In his decision, the ALJ identified the jobs of trainman, apprentice engineer, and convenience store manager/owner, but not janitor, as Plaintiff's past relevant work (Tr. 1064).

Case No. 3:09cv52/WS/EMT

B.     Relevant Medical History

While in Vietnam Plaintiff was exposed to the defoliant chemical Agent Orange (Tr. 587). In 1971, when he was still in the Air Force, Plaintiff developed a cyst in the right breast, which was excised, and he was also treated for a skin condition (*id.*). Plaintiff's Air Force medical records reflect that in May 1972, when he was stationed in Vietnam, Plaintiff complained of headaches, an inability to sleep, anxiety, and hallucinations (Tr. 659). Plaintiff was prescribed medication and given work restrictions (*id.*). In hearing testimony given January 15, 1993, Plaintiff stated that, due to his mental state, he was medically evacuated from Vietnam to the United States eighteen days before his tour of duty was scheduled to end (Tr. 100–01). During an examination in July 1972, it was noted that Plaintiff "demonstrates no psychiatric disorder at present" (Tr. 660). It was further noted that "[h]is problems in Vietnam last spring evidently were part of a transient situational disturbance now totally resolved. He is psychiatrically fit for discharge from the USAF" (*id.; see also* Tr. 661–63).

There appear to be no additional treatment records in the administrative file from the date of Plaintiff's discharge from the military in 1972 until June 3, 1985, when Plaintiff was admitted to a VA medical center[7] for treatment of a high fever and a skin condition (Tr. 193–202). Later the same month, on June 20, 1985, Plaintiff was hospitalized again for excision of tissue from the left breast (Tr. 203–13). On the admission report, under "General Appearance and Mental Status," is the comment that "[p]atient is alert, [illegible] well-oriented, in no acute distress" (Tr. 211). Although the June 1985 records—many of which are handwritten and difficult to decipher—reference treatment for Plaintiff's physical problems, none appear to mention any complaints, diagnosis, or treatment of psychiatric problems[8] (*see* Tr. 193–213; Tr. 597–613). Following his surgery, and through December 1985, Plaintiff was seen as an outpatient for surgical

---

[7]  Over the course of his lengthy treatment history, Plaintiff was seen at numerous VA facilities located in Florida, Alabama, Louisiana, and Mississippi. This summary of Plaintiff's medical records does not attempt to identify the specific VA facilities where treatment was provided.

[8]  Plaintiff testified at the May 10, 2005, administrative hearing, however, that he was hospitalized in June 1985 for "the same thing that happened while I was in the military," that is, PTSD (Tr. 1341).

follow-up and for other physical conditions, including facial pseudofolliculitis, gynecomastia, and tinea versicolor[9] (Tr. 602–13). These records likewise do not reference psychiatric problems.

About one year after his June 1985 hospitalizations, Plaintiff underwent a comprehensive physical examination, presenting to a VA medical facility on June 23, 1986, with complaints of a mass in the right breast and a rash (Tr. 589). In addition to a physical examination, an electrocardiogram, radiographs, blood chemistries, and a urinalysis were ordered (Tr. 585–96). In the patient history portion of the examination report, under the "neuropsychiatric systems" section, is the following notation: "Chronic nervous problems, worsening because of worrying about his medical problems [with] rash" (Tr. 588). The report further reflects that no dermatology, neurology, or psychiatry work-ups or consultations were performed but, in connection with an "Infertility/Genetic Problem," blood work was sent to a cytogenics reference laboratory to rule out a "suspected chromosome abnormality"[10] apparently related to Plaintiff's Agent Orange exposure in Vietnam (Tr. 589). The examination report also identifies the diagnoses of gynecomastia and tinea versicolor (*id.*).

In July 1986 Pat O'Connell, M.D., a psychiatrist, evaluated Plaintiff (Tr. 273–77). In his assessment dated July 8, 1986, Dr. O'Connell noted Plaintiff's report that he had been unemployed since 1981 after being fired from his job as a train engineer trainee (Tr. 273). Plaintiff stated that he had tried to work several times since then without success; he presently volunteered with the Disabled American Veterans as a chauffeur for an elderly woman. Plaintiff complained of "nerves," or anxiety (*see* Tr. 274), but he also admitted to symptoms of depression, including insomnia, irritability, withdrawal, diminished energy, memory impairment, and somatic preoccupation (Tr. 273). Dr. O'Connell administered the Minnesota Multi-Phasic Personality Inventory ("MMPI") to Plaintiff. Although he noted that some of Plaintiff's responses could suggest an invalid test, Dr. O'Connell concluded that the profile was essentially within normal limits, with some scale

---

[9] Pseudofolliculitis of the beard is a condition in which ingrown hairs irritate the skin and cause small facial pustules. The Merck Manual, 815 (1999, 17th ed.). Gynecomastia is the abnormal overdevelopment of the mammary glands in the male. Attorney's Illustrated Medical Dictionary G33 (1997). Tinea versicolor refers to patches of dark and light scales on the skin which are caused by a yeast-like fungus. *Id.* at T45.

[10] Subsequent records indicate that the condition suspected was Klinefelter's syndrome, a sex chromosome abnormality. The Merck Manual, 2239 (1999, 17th ed.)

elevations suggesting certain personality characteristics, such as somatization defenses and repression or denial of psychological conflicts (Tr. 271).

Summarizing his clinical findings, Dr. O'Connell reported that:

> this patient with an ostensibly normal pattern of personality adjustment prior to military service complains now of anxiety which he attributes to surgery for gynecomastia in 1985. He complained also of depressive symptoms which were milder and of which he seemed only peripherally aware. They seem to be able to be traced back to service in Vietnam, and consist of mildly depressed mood, irritability, social withdrawal not to mention the anxiety of his primary complaint, diminished energy, and dreams about Vietnam experience.

(Tr. 274). Dr. O'Connell's diagnostic impressions were (1) psychological factors affecting physical condition; (2) adjustment disorder with anxious mood; and (3) possible PTSD, chronic, mild (Tr. 274). Dr. O'Connell recommended outpatient psychotherapy and psychopharmacotherapy and referred Plaintiff to a local community health center for such care (*id.*).

In August 1986 Plaintiff underwent an Agent Orange examination exit interview through the VA, during which the results of his chromosome and blood chemistries tests and his gynecomastia diagnosis were discussed (Tr. 581). Plaintiff was also seen by VA health care providers as an outpatient in September 1986, when he complained of "nerves," and in early October 1986, when he was diagnosed with probable hyperthyroidism (*see* Tr. 572–79). Plaintiff was hospitalized for evaluation of hyperthyroidism from October 8 to October 16, 1986 (Tr. 214–67). On admission Plaintiff reported that he got "nervous" and "sweat[ed] a lot" (Tr. 238), but he denied any neuropsychiatric symptoms, including depression or mental disorder (Tr. 240). The nursing diagnosis was "potential for anxiety [due to] lack of knowledge concerning diagnosis/treatment" (Tr. 241). Plaintiff reported that he had experienced, for approximately one year, what were described as "'classic'" symptoms of hyperthyroidism, including "nervousness, tremor, weight loss, diarrhea, dyspnea, irritability, tachypalpitations, and diaphoresis," as well as, recently, a swelling on the anterior aspect of the neck (Tr. 229). Plaintiff's hospital discharge summary reflects diagnoses of Graves' disease; rule out Klinefelter's syndrome; cystic acne; and history of bilateral gynecomastia, status post tissue excision bilaterally in 1971 and 1985 (Tr. 214). Among other procedures, while he was hospitalized Plaintiff underwent thyroid ablation therapy with I-131, or radioiodine, for his Graves' disease (*id.*). Plaintiff also presented to VA physicians several times in November and

December 1986 to follow-up on his thyroid condition and for various dental concerns (Tr. 567–71). Other than to the extent noted, Plaintiff's VA records for 1986 do not appear to reference psychiatric complaints or care.

The remainder of Plaintiff's voluminous medical records pertains to the period after his insured status expired on December 31, 1986, including the records summarized below through April 1992, when Plaintiff was found disabled and entitled to benefits for purposes of SSI.

A record from the VA dated March 20, 1987, reflects that Plaintiff complained of "constant tension, at times mild trembling, diff[iculty] falling asleep & staying asleep, fatigue in daytime" since approximately the winter of 1985 (Tr. 558). Plaintiff reported that he had felt "much better" since early February 1987, when he had increased his compliance with Inderal.[11] The patient history section of the report reflects that Plaintiff was "in Viet. War – reports little to ⊘ psych. sequelae" (*id.*). Plaintiff's mental status when examined was "slightly anxious" (*id.*). He was oriented, alert, his thought processes were within normal limits, and his affect was appropriate (Tr. 557).[12] The diagnosis was adjustment disorder with anxious mood "<u>most</u> likely, however, [due to] poor compliance with propranolol" (*id.*) (emphasis in original). Plaintiff's medications were adjusted, including discontinuing the use of propranolol "to simplify" the drug regimen and continuing the use of Inderal (*id.*). Plaintiff returned for a follow-up visit for treatment of anxiety on April 21, 1987 (Tr. 555). It was noted that Plaintiff psychiatric condition was "related to his thyroid problem" and that currently, Plaintiff's "sleep & daytime anxiety [were] greatly improved" (*id.*) Plaintiff's diagnoses were adjustment disorder with anxiety, hypertension, and acne. He was advised to continue taking Inderal and other prescribed medications (*id.*). A VA physician stated in a letter dated April 21, 1987, that Plaintiff was being "treated for mild anxiety associated with his disorder of thyroid function. On his medication, his physical and mental status are within normal limits" (Tr.

---

[11] Inderal, which is composed of propranolol hydrochloride, is approved for use in the management of hypertension, among other conditions. <u>Physicians' Desk Reference</u>, 3377–78 (2001, 55th ed.). Although not approved for such use, propranolol reportedly is also used in the treatment of certain anxiety disorders. *See, e.g.,* http://www.ncbi.nlm.nih.gov/pubmed/1686251?ordinalpos=16&itool=EntrezSystem2.PEntrez.Pubmed.Pubmed_Res ultsPanel.Pubmed_DefaultReportPanel.Pubmed_RVDocSum

[12] Page 557 appears to be a continuation of Page 558, although the former is dated March 19th and the latter is dated March 20, 1987.

376). The physician identified Plaintiff's diagnoses as anxiety, mild, which was secondary to his status of post thyroid ablation; hypertension which was well-controlled; and cystic acne (*id*).

Plaintiff was seen at a VA facility several times in May, June, and July of 1987 for his Graves' disease and skin condition; the reports of these visits do not refer to any psychiatric complaints (Tr. 550–53). In a VA treatment note from September 1987 Plaintiff's anxiety disorder was described as "mild" and "related to thyroid dysfunction" (Tr. 545). He was described as "look[ing] much calmer" (*id.*). Plaintiff was advised to continue taking his medications. In a February 1988 progress report, Plaintiff's anxiety disorder was again noted to be related to thyroid dysfunction (Tr. 538). Plaintiff's condition was described as "stable since Feb/87 – apparently compliant with meds" (*id.*).

Robert W. Love, Jr., M.D., evaluated Plaintiff on February 24, 1988 (Tr. 669; 364–66). In his assessment Dr. Love provides a narrative outlining Plaintiff's lengthy personal, employment, and medical histories, as well as a legal history that included numerous arrests. As reported to Dr. Love, Plaintiff had been fired from his job as a trainman and had problems with local attorneys over the disposition of his house. Dr. Love observed that Plaintiff appeared to be an intelligent person but that as he had heard only Plaintiff's side of the story regarding the loss of his job and house he could not determine "whether this is an intensely paranoid acutely angry man" or whether Plaintiff, who is black, actually had been "the victim of a racial conflict or misunderstanding" (Tr. 365). Dr. Love concluded that he could "not specify a psychiatric diagnosis in this case" (Tr. 366). In August 1988, Dr. O'Connell—the psychologist who evaluated Plaintiff in July 1986—re-examined him (Tr. 268–72). Plaintiff reported to Dr. O'Connell that he continued to volunteer and also assisted an elderly woman with her rental apartments, but he remained unemployed; his social life included dating occasionally, playing softball, visiting with friends, and occasionally attending a party or going out to a bar (Tr. 268). Plaintiff attended church and spent his free time reading, including reading his Bible (*id.*). While Plaintiff reported that his physical condition had improved, he stated that his "nerves" were still problematic; medication, however, had helped both his sleep and anxiety (*id.*). Dr. O'Connell's assessment was "[p]sychological factors affecting physical condition, chronic, mild to moderate, in fair remission on medication"; "[a]djustment disorder with anxious mood, chronic, mild, in fair remission on medication"; and "possible post-traumatic stress disorder,

chronic, mild" (Tr. 269).  Through 1988 Plaintiff continued to be followed by VA physicians for his Graves' disease, hypertension, cystic acne, and other physical complaints, with only an occasional mention of treatment for anxiety (Tr. 509–537).  Plaintiff's VA treatment records for 1989 likewise reflect almost exclusively notations for medical, rather than psychiatric, problems (Tr. 499–509).

In May 1990 Plaintiff sought help for his "nerves," describing himself as "jittery" and depressed (Tr. 495–96).  Most aspects of the examination were unremarkable, although the evaluator commented that Plaintiff exhibited little insight into his illness (Tr. 495).  During an October 1990 examination Plaintiff stated that his medication was helping him (Tr. 494).  He was assessed with anxiety related to situational stressors, referred to the social work department for assistance due to a lack of funds and housing, and advised to return in one month for further care (Tr. 492–93). Plaintiff reported in December 1990 that mentally he was "doing pretty well"; he was described as being "stabilized on medication" (Tr. 487–88).  Plaintiff was also treated for his physical ailments by VA health care providers through December 1990 (*see* Tr. 489–91).

Plaintiff continued to be seen by VA physicians through 1991 for both his physical and mental problems (Tr. 439–86).  In January 1991 Plaintiff reported during a mental health evaluation that he was doing well with his current medications, and he was assessed as being stable (Tr. 486). Plaintiff also presented for vocational assessment and guidance in January 1991 (Tr. 482–85), and notations of mental health clinic visits in March and September 1991 reflect that Plaintiff was stable on his psychiatric medications (Tr. 452–53; 481; 484).  In December 1991 Plaintiff reported during a mental health consultation that he was doing "pretty well" and that he had recently filed for disability based on his thyroid and hypertension conditions (Tr. 439).  The evaluator noted that Plaintiff appeared to have increased anxiety related to the situational stressors of being unemployed and having numerous physical ailments.  She decided not to discharge Plaintiff at that time but rather advised him to return in June 1992 and to continue his prescribed medications in the interim (*id.*).

The record appears to contain no reports of any VA mental health clinic visits for the period from January through April 1992, when Plaintiff filed his SSI and DIB applications.  Plaintiff received treatment by a VA physician in January 1992 for his physical conditions (Tr. 435–36), however, and in February 1992 he was seen by a VA social worker (Tr. 434).  Also in February

1992, Plaintiff underwent various diagnostic tests, including blood chemistries, an electrocardiogram, and an x-ray (Tr. 428–33).

C.     Post-April 1992 Psychological Records and Evaluations

In June 1992 Plaintiff was seen at a VA mental health clinic (Tr. 631). Plaintiff reported that he continued to be unemployed but was looking for work. Plaintiff indicated he was coping "okay" (*id.*). His affect was normal, calm, and appropriate, with clear and relevant speech and no evidence of thought disorder (*id.*). A July 1992 report was similar, with Plaintiff reporting that he was coping well in spite of the situational stress he was experiencing (*id.; see also* Tr. 628–29). In September 1992 Plaintiff reported that he was doing "about the same" and had cut back on his medications (Tr. 630). His affect and mood were normal, with no evidence of thought disorder. An October 1992 VA mental health clinic report indicates that Plaintiff was "coping fairly well [with] life's events" (Tr. 626–27). A December 1992 report states that Plaintiff had recently begun to think about his past life experiences, which had increased his stress levels and caused him to present to an emergency room (Tr. 626).

A January 1993 VA mental health clinic note indicates that Plaintiff was forced to leave his residence and stay with friends because he was no longer receiving unemployment compensation (Tr. 621). He was referred to a social worker to seek financial assistance. Plaintiff underwent a psychiatric evaluation in March 1993 by Luis N. Zumarraga, M.D., at the request of the Commissioner (Tr. 639–45). Dr. Zumarraga noted that Plaintiff's speech was soft, rational, and appropriate; there was no evidence of any looseness of association, although Plaintiff did have some difficulty effectively verbalizing his condition (Tr. 639). Plaintiff was oriented to time, place, person, and situation, and he appeared to be of above average intelligence, with intact memory processes (*id.*). There was no evidence of hallucinations or delusions, which experiences Plaintiff also denied. Plaintiff's judgment was adequate, though poor, and his insight varied from fair to poor. Dr. Zumarraga's diagnosis was dysthymic disorder. He was unable to substantiate a diagnosis of PTSD in the absence of any identifiable traumatic stressors, but he noted the presence of symptoms of depression and anxiety (Tr. 641). Dr. Zumarraga thought Plaintiff might benefit from vocational training and a return to work (*id.*). In the mental RFC questionnaire he completed, Dr. Zumarraga noted mostly mild or slight impairments and estimated that the same level of severity had

existed from the 1980s (Tr. 642–44). Plaintiff continued to present to a VA mental health clinic for treatment through 1993. The treatment notes reflect that he received refills of his medications and at times reported his ongoing efforts to obtain VA and Social Security benefits, as well as his continued but unsuccessful efforts to find work (*see, e.g.,* Tr. 731; 744; 752).

Plaintiff's VA mental health clinic records for February through October 1994 reflect treatment for PTSD; it was noted that Plaintiff was experiencing stress in connection with his disability claims and inability to obtain work and, in August 1994, that he was incarcerated (Tr. 766; 771; 775–77; 780–81; 790). From December 1994 until early February 1995 Plaintiff was admitted to a VA facility and placed in a PTSD treatment program (Tr. 655–56). His symptoms included flashback nightmares, hyper-irritability, worrying, and a tendency to be withdrawn. Plaintiff's verbal productions were relevant and coherent, with a somewhat anxious mood and underlying depression; affect was consistent with mood (Tr. 655). Plaintiff exhibited a tendency for some paranoid ideation; he denied hallucinations and was oriented times three, with some recent memory impairment but fair past memory. His intelligence was average, with fair insight and judgment (*id.*). Plaintiff was placed on several medications, for both his physical and mental problems, and he progressed satisfactorily (Tr. 656).

Plaintiff wanted to be readmitted to the PTSD program in March 1995 but admission was refused (Tr. 811; 816; 819–24). In April 1995 Plaintiff, who had been living in his car, began residing at a VA domiciliary (Tr. 828–29; 859). His VA medical records indicate several visits to the domiciliary's clinic as well as to a VA medical facility (Tr. 829–55). Plaintiff's medical records also reflect several visits to a VA medical facility in May 1995, where he presented for psychiatric complaints, including depression, anxiety, anger, and sleep disturbances (Tr. 901–04). His diagnosis was PTSD (Tr. 902). In July 1995 Plaintiff reported his medications were helping him (Tr. 889). Plaintiff continued to experience nightmares and disturbing dreams, however, as well as problems with his short-term memory and intrusive thoughts of events that had occurred when he was stationed in Vietnam (*id.*). From May through September 1995 Plaintiff regularly took part in group therapy sessions and underwent numerous brief psychiatric assessments; among other complaints, he reported continued nightmares and sleep disturbance problems (Tr. 664–67; 863–79; 882–88; 912–21; 927).

Blaine C. Crum, Ph.D., examined Plaintiff in August 1995 and administered the MMPI-II, which indicated accentuated symptomotology (Tr. 905–09). Dr. Crum's diagnosis was PTSD with personality factors reflecting a more severe disorder (schizophrenic symptomatology) (Tr. 906). Dr. Crum noted in his report that Plaintiff's

> psychological profile indicated extensive and long term psychological problems. He has been struggling for a long period of time in an effort to deal with the residuals of his Vietnam experiences. There is an undercurrent of depression and anxiety, combined with a diminished energy level that reflects his overall distress. Many of these features are reflected in health symptomatology, which is also reinforced by various physical problems as well as being a reflection of his emotional difficulties (sleep problems, anxiety, depression). Additional features in his personality appear to be paranoid and schizophrenic elements which are reflected in his emotional withdrawal, feelings of distrust, feelings of alienation, and a general pattern of isolation which seems to serve as a defensive tactic to control the pressure and stress that he continually feels.

(Tr. 906–07). Additionally, Dr. Crum completed a Supplemental Questionnaire as to Residual Functional Capacity, in which he opined that Plaintiff had a marked limitation with respect to his ability to maintain the activities of daily living and social functioning. Dr. Crum also thought Plaintiff would experience frequent deficiencies of concentration, persistence, or pace and frequent episodes of deterioration or decompensation. Plaintiff was markedly limited in his ability to respond appropriately to supervision and co-workers; to understand, carry out, and remember instructions; to perform simple tasks; and to perform repetitive tasks (Tr. 908–09). Although asked to do so, Dr. Crum did not give his opinion as to the earliest date the same level of severity had existed (Tr. 909).

A counselor at the Pensacola Vet Center, James F. Sneed, MSW, advised the VA in an October 1995 letter that Plaintiff had been in treatment with him since February 1994, having presented with symptoms of depression and an abnormally high level of anxiety, rage reactions, withdrawal and isolation, increased startle response, sleep disturbance, nightmares, and intrusive thoughts of Vietnam (Tr. 950). Plaintiff's diagnoses included PTSD, delayed onset, chronic, and his condition was described as severe, with the prognosis for significant improvement doubtful (Tr. 950-51).

Plaintiff underwent a psychological evaluation by J.D. Matherne, Ph.D., in November 1995 at the request of the Disability Determination Services (Tr. 934–44). Dr. Matherne noted that

Plaintiff had been hospitalized for three months approximately one year earlier with a diagnosis of PTSD and was scheduled for additional inpatient treatment for PTSD (Tr. 935–36). According to Dr. Matherne, Plaintiff "is a somewhat anxious and depressed individual" who asserts he has been depressed since the Vietnam War; Plaintiff acknowledged problems with anger management and homicidal thoughts from time to time, and he also suffered hallucinations (Tr. 937). On the basis of intelligence tests he administered, Dr. Matherne concluded that Plaintiff functioned within the borderline range of intelligence (Tr. 939). The diagnostic impression was PTSD by history; alcohol abuse, episodic, in apparent remission by history; and mixed personality disorder (Tr. 940).

Plaintiff was hospitalized in November 1995 at a VA facility to assess his eligibility for a treatment program (Tr. 946–48). Plaintiff's diagnosis was PTSD, schizophrenia-paranoid type (Tr. 946). He was not accepted into the program after it was determined he was hallucinating, inattentive, and preoccupied with internal thoughts and impulses; it was thought that his "active psychotic process" would prevent him from benefitting from the program (Tr. 948).

Mr. Sneed, from the Pensacola Vet Center, advised in a June 1998 letter that Plaintiff had been in treatment with him since February 1998 (Tr. 988).[13] In language virtually identical to that which he used in his October 1995 letter (Tr. 950–51), Mr. Sneed described Plaintiff's symptoms of depression and anxiety. Plaintiff's diagnoses were PTSD, delayed onset, chronic; and chronic and severe depression.

Psychologist Frank A. Brown, Ph.D., examined Plaintiff in July 1998 at the Commissioner's request (Tr. 989–92). Dr. Brown noted that Plaintiff's memory for facts about his life was good; he was alert and oriented for time, place, and person; deliberate in conversation; and logical in his thought processes, which also were well organized. His thought content was neither grandiose nor suspicious. Plaintiff's mood was tense and he seemed preoccupied with his military experience in Vietnam, blaming all of his problems on the stress he had endured there (Tr. 989). Intelligence testing placed Plaintiff in the dull normal range, but Dr. Brown thought Plaintiff's intellectual ability was somewhat higher as Plaintiff had refused to persist as well as he could have during testing. Dr.

---

[13] The court notes that Mr. Sneed stated in his June 1998 letter that Plaintiff had been in treatment with him since February 1998 but that in his letter of October 1995 (Doc. 950–51) Mr. Sneed indicated that Plaintiff had begun treatment with him in February 1994.

Brown also recounted Plaintiff's educational background, including that he had graduated from high school and later attended junior college following his military service and employment with the railroad. He noted that Plaintiff's background included treatment for mental health problems and numerous arrests. The MMPI was administered but rendered what Dr. Brown concluded was an invalid profile because Plaintiff admitted to a wide variety of highly unusual symptoms (Tr. 991). Plaintiff reported that his medications helped to reduce his anxiety but that he still felt depressed due to his war experiences. Dr. Brown noted that Plaintiff had little insight into his "emotional dynamics," and he described Plaintiff as being "rather anxious," "somewhat obsessive-compulsive," and suffering "significant symptoms of Posttraumatic Stress Disorder" (Tr. 991–92). Nevertheless, Plaintiff remained "somewhat functional" in his personal habits and had also been able to do volunteer work for veterans' organizations (Tr. 992). Dr. Brown's diagnosis was obsessive-compulsive personality and PTSD, which by Plaintiff's account had improved with treatment. Dr. Brown also noted that despite a reported history of auditory hallucinations, Plaintiff had not hallucinated recently, although he apparently suffered from intrusive thoughts about the war without any identifiable trigger (*id.*). Dr. Brown also completed a Supplemental Questionnaire as to Residual Functional Capacity (Tr. 993–94). In this Questionnaire Dr. Brown opined that Plaintiff was slightly limited in his ability to maintain the activities of daily living and social functioning and would seldom experience deficiencies of concentration, persistence, or pace; Plaintiff experienced "slight" episodes of deterioration or decompensation, and he was mildly limited in his ability to respond appropriately to supervision and co-workers; understand, carry out, and remember instructions; perform simple tasks; and perform repetitive tasks (Tr. 993–94). Dr. Brown opined that the earliest date the same level of severity had existed was January 1997 (Tr. 994).

In October 1998, at the request of Plaintiff's counsel, psychologist Joseph G. Law, Ph.D., examined Plaintiff (Tr. 1012–22). In his report dated October 12, 1998, Dr. Law stated that Plaintiff's psychological stressors included unemployment, financial problems, and numerous health concerns. Dr. Law briefly outlined Plaintiff's education and work experience before and after entering the military and, in greater detail, some of the frightening events Plaintiff reported he had experienced while serving in Vietnam, where he drove trucks containing ammunition, bombs, and

rockets; Dr. Law commented that, as a veteran himself who had also served in Vietnam, Plaintiff's accounts of his experiences seemed valid (Tr. 1012–13).

Dr. Law noted that Dr. Brown had previously administered the MMPI to Plaintiff. Dr. Law—who noted his experience interviewing approximately five thousand veterans—questioned Dr. Brown's conclusion that Plaintiff's MMPI result was invalid, stating that patients with PTSD may produce elevated results which are a symptom of the syndrome rather than of malingering or psychosis (Tr. 1015). Dr. Law administered several tests, including the Symptom Checklist 90-R. On this test Plaintiff reported many symptoms of obsessive compulsive disorder, as well as symptoms of anxiety, depression, and post traumatic stress (*id.*). With respect to the Sixteen Personality Factor Test Dr. Law administered, he noted that Plaintiff's responses reflected he was very shy, introverted, aloof, and distant (*id.*). He had difficulties relating to other people; was very threat-sensitive, hypervigilant, suspicious, and skeptical of others; was filled with apprehension, self-doubt, and frequent worry; and had a great deal of anxiety and depression (*id.*). The Bender-Gestalt test suggested fairly severe visual motor impairment, and Plaintiff's score on the Weschler Memory Scale showed severe memory deficits that Dr. Law thought could be consistent with dementia (Tr. 1016). Dr. Law's diagnoses were PTSD, chronic, severe, and obsessive-compulsive personality (Tr. 1017). Dr. Law opined that Plaintiff was not mentally capable of sustaining work activity, was not a candidate for vocational rehabilitation or job placement assistance, and required supportive psychotherapy, as well as psychiatric and medical care (*id.*). According to Dr. Law, Plaintiff had slight restrictions in activities of daily living; marked difficulties in maintaining social functioning; frequent deficiencies of concentration, persistence or pace; and repeated episodes of deterioration or decompensation in work or work-like settings (Tr. 1021). Plaintiff's PTSD prevented him from working with other people, taking supervision appropriately, or dealing with the public without emotionally reacting, and his ability to understand, remember, and carry out instructions was markedly impaired (Tr. 1017). In his report, Dr. Law did not offer an opinion as to when Plaintiff's symptoms had become disabling.

In a letter dated November 12, 1998, to Plaintiff's counsel confirming their recent telephone conversation, Dr. Law apologized for failing to provide an opinion in his October 12, 1998, report as to Plaintiff's disability onset date. Dr. Law noted in his letter that:

> Given the length of time [Plaintiff] has been suffering and his confused presentation of historical data, it is difficult to give a precise onset date or one with a high probability of validity. However, it is clear that he has been struggling with his post traumatic stress symptoms since his return from Vietnam. The fact that he was diagnosed as having "situational anxiety" in 1972 while in the Air Force suggests that his PTSD was manifest at that time. <u>Note that the current psychiatric manual in 1972 was the DSM-II and it did not even contain a category for post traumatic stress disorder</u>. That diagnostic label was not promulgated until 1981 with the publication of the DSM-III. Most Vietnam vets with PTSD were diagnosed with a general label such as anxiety or personality disorder.

> I am confident that he has suffered with PTSD since 1972. His inability to continue with steady employment in the mid-1980s gives us a good (though not perfect) marker for the beginning of [the] periond [sic] in which he was unable to meet the demands of work.

(Tr. 1036) (emphasis in original).

Dr. Law wrote a second, revised letter to Plaintiff's counsel, also dated November 12, 1998. This version is identical to the first, except for the alteration to the second sentence of the second paragraph, italicized below:

> I am confident that he has suffered with PTSD since 1972. *It is my opinion based upon a reasonable degree of psychological certainty, that Mr. Petty's mental impairments reached such a degree of severity that he was unable to meet the mental demands of employment as of June 3, 1985.*

(Tr. 1040).

A VA treatment note dated October 20, 1998, states that Plaintiff reported problems with short term memory for approximately six months, depression, low energy, anxiety, and intrusive thoughts, but he denied having hallucinations (Tr. 1035). Plaintiff was worried about getting his PTSD service-related disability and Social Security claims approved. A mental RFC questionnaire completed by a VA physician on October 20, 1998, reflects marked restrictions in all functional areas (Tr. 1033–34). With respect to the earliest date the same level of severity existed, the physician noted in part that "Pt. has suffered from increasing symptoms of PTSD since serving in Viet Nam 1969 through 1972. . . ." (Tr. 1034).

In October 2002, psychologist Neil P. Lewis, Ph.D., prepared responses to interrogatories propounded by the Commissioner, as well as to several questions propounded by Plaintiff's counsel, in connection with the ALJ's decision entered March 5, 2003 (Tr. 1139–46). Dr. Lewis was asked

to list Plaintiff's psychologic/psychiatric impairments which were demonstrable for the period June 3, 1985, through December 31, 1986, as well as identify the severity of the impairments and the objective findings in support.  Responding, Dr. Lewis stated the record documented that during the time at issue Plaintiff "was experiencing mild to moderate anxiety and depression due in part to worrying about his medical problems along with possible mild PTSD" (Tr. 1139).  Dr. Lewis cited as support for this conclusion the VA medical record dated June 23, 1986 (Tr. 588), and Dr. O'Connell's psychiatric evaluation dated July 7, 1986 (Tr. 273).  Dr. Lewis also prepared a mental RFC assessment of Plaintiff for June 3, 1985, through December 31, 1986 (Tr. 1141–42).  In this assessment Dr. Lewis opined that during the period at issue Plaintiff had experienced moderate limitations in his ability to maintain attention and concentration for extended periods; to work in coordination with others without being distracted by them; to complete a normal workday and workweek; to interact appropriately with the general public; and to get along with co-workers.  In all other areas Plaintiff was not significantly limited (*id.*).  Answering interrogatories submitted by Plaintiff's counsel, Dr. Lewis noted that he had reviewed the administrative file provided to him, or pages 62 through 1040, plus additional medical records at Exhibit 77 and the Report and Recommendation, Order, and Judgment from the district court (Tr. 1140).  Dr. Lewis also opined that Plaintiff's condition was worse on April 2, 1992, compared to December 31, 1986, and June 3, 1985, on which earlier dates the severity of his impairments was mild to moderate as documented by the June 23, 1986, VA medical record and Dr. O'Connell's July 7, 1986, evaluation.  According to Dr. Lewis, Plaintiff's impairments also would have affected his ability to work on or before both June 3, 1985, and December 31, 1986.

The administrative file also contains records from the VA from 2001 to 2005.  During this period Plaintiff was treated for his physical complaints by his regular physician as well as for his mental complaints, including chronic PTSD, by psychiatrist Margaret A. Miller, M.D.; he was also interviewed frequently by social workers (Tr. 1111–37; 1195–1247; 1262–93; 1305–23).  Dr. Miller completed the first of four mental RFC assessments of Plaintiff on August 1, 2002 (Tr. 1102–04).  In this assessment Dr. Miller indicated that Plaintiff had a slight restriction in his activities of daily living; was markedly restricted in his ability to maintain social functioning and to maintain concentration, persistence, or pace; and would experience extreme episodes of decompensation.

Additionally, Plaintiff had marked limitations with respect to the following abilities: to understand, remember, and carry out instructions; to respond appropriately to supervision and co-workers in a work setting; and to perform simple or repetitive tasks. In response to a question asking her opinion as to when Plaintiff first suffered the limitations at the level of severity indicated in the evaluation, Dr. Miller noted that Plaintiff "started receiving treatment for combat PTSD at VA Pensacola in 1990" (Tr. 1103).

Dr. Miller completed three additional mental RFC assessments of Plaintiff, dated August 13, 2002; June 1, 2004; and April 4, 2005 (*see* Tr. 1106–08; Tr. 1189–90; Tr. 1294–95). Dr. Miller's August 13, 2002, assessment is generally similar to her August 1, 2002, evaluation, but she noted restrictions of slightly less severity in three areas in the later report; to a question asking when Plaintiff had first suffered the limitations at the indicated level of severity, Dr. Miller responded, "Pt. has had it for years, probably since his return from Viet Nam" (Tr. 1107). In her June 1, 2004, assessment, Dr. Miller noted that Plaintiff required increased functional restrictions; with respect to the onset date of Plaintiff's more severe symptoms, she commented that Plaintiff "started coming to the VA in Pensacola for treatment for PTSD in 1990" (Tr. 1190). Per Dr. Miller's April 4, 2005, RFC assessment, Plaintiff's symptoms had worsened further; in response to the question inquiring the date Plaintiff first suffered the limitations at the level of severity indicated in the evaluation, Dr. Miller noted "[s]ince 1990, or earlier" (Tr. 1295). With respect to each of the four assessments, Dr. Miller indicated that no psychological evaluation had been conducted at that time (Tr. 1103; 1107; 1190; 1295).

V.    ISSUE PRESENTED

Plaintiff argues for reversal with an award of benefits or, alternatively, remand for further proceedings on the following ground: in assessing Plaintiff's mental RFC prior to the expiration of his insured status, the Commissioner erred by giving determinative weight to the opinion of Dr. Lewis, a non-examining consultant, rather than to the opinion of Dr. Law, an examining psychologist with significant expertise and experience in treating veterans. According to Plaintiff, Dr. Lewis' opinion that Plaintiff was not disabled by his mental impairments prior to December 31, 1986, is not supported by the medical evidence while Dr. Law's assessment of disability as of June 3, 1985, is corroborated by the report of examining psychologist Dr. Crum; additionally, the findings

of treating physician Dr. Miller corroborate the opinions of both Dr. Law and Dr. Crum. Had the ALJ accepted Dr. Law's well-supported opinion, Plaintiff contends, a finding of "disabled" at step five would have been compelled in light of the VE's testimony that, if the restrictions noted by Dr. Law were credited, there would be no jobs Plaintiff could have performed prior to his DLI. Plaintiff also challenges the impartiality of an interrogatory posed to Dr. Lewis, arguing that in quoting a section of the Report and Recommendation adopted by the district court the ALJ's question improperly suggested to Dr. Lewis that he should provide a response which marginalized Dr. Law's opinion.[14] Responding in opposition, the Commissioner argues that the ALJ properly determined Plaintiff's mental RFC prior to his DLI, giving appropriate weight to the medical opinions of Drs. Law, Crum, Miller, and Lewis. Additionally, the Commissioner submits, in light of the ALJ's treatment of the opinions of Drs. Law, Crum, Miller, and Lewis, the ALJ properly credited the VE's testimony that Plaintiff could have worked as a janitor, laundry operator, and assembly worker as of December 31, 1986. Morever, Dr. Law's status as a Vietnam veteran with extensive experience interviewing soldiers does not entitle his opinion to special weight, and the manner in which the challenged interrogatory was posed to Dr. Lewis did not influence his answer. According to the Commissioner, the decision finding that Plaintiff was not disabled prior to his DLI and denying benefits should be affirmed because it fully comports with applicable law and is supported by substantial evidence.

VI.    DISCUSSION

In his decision, the ALJ discounted the reports of Drs. Law and Crum, finding their opinions were not consistent with the medical evidence of record, in particular with respect to the relevant period of June 3, 1985, through December 31, 1986. The ALJ further determined that the reports of Drs. Crum and Law did not identify the documentation on which the examiner had relied in

---

[14] Specifically, Plaintiff challenges the second sentence of the second part of Interrogatory #8 (Tr. 1145). The first part of this interrogatory asks whether there is sufficient evidence to permit forming an opinion of Plaintiff's medical status during the relevant period of June 3, 1985, through December 31, 1986. In the second part it states "Please **NOTE** – as a finding of law, the United States District Court Judge has determined the claimant's mental condition satisfies the de minimis threshold as of December 31, 1986 to establish a 'severe' mental impairment at Step 2 of the sequential analysis; so the issue becomes one of the degree of 'severity' in the relevant period. Further, the Court has concluded that a rejection of any opinion by psychologist J. G. Law, Jr., Ph.D., that disability commenced prior to December 31, 1986, is substantiated in that the opinion, at most, lends some evidentiary support to the conclusion that the de minimis threshold requirement at Step 2 is satisfied" (Tr. 1145).

reaching his opinion; also, each report was based on a one-time evaluation of Plaintiff. Concluding there was a lack of documentation to identify an adequate objective basis for the opinions of Drs. Crum and Law, the ALJ gave the opinions lesser weight. With regard to Dr. Miller, the ALJ noted that although she indicated in her last assessment that Plaintiff had suffered marked restrictions in mental functioning since 1990 or earlier, she did not provide a definitive date as to when Plaintiff's disability had commenced. The ALJ thus also implicitly assigned Dr. Miller's opinion lesser weight. The ALJ accorded greater weight to Dr. Lewis' opinion that Plaintiff at most experienced moderate restrictions in mental functioning during the period from June 3, 1985, through December 31, 1986, on the ground Dr. Lewis' opinion was consistent with the longitudinal record of Plaintiff's treatment during the relevant period.

When considering the testimony of a treating physician, such as Dr. Miller, the ALJ ordinarily must give such testimony substantial or considerable weight. Phillips v. Barnhart, 357 F.3d 1232, 1240 (11th Cir. 2004); see also 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). The opinion of a one-time examining physician—or psychologist such as Dr. Law in this case—is not entitled to the same deference, however. See Crawford v. Comm'r of Soc. Sec., 363 F.3d 1155, 1160 (11th Cir. 2004). With respect to either a treating or an examining source's testimony, good cause exists to discredit the testimony when it is contrary to or unsupported by the evidence of record. See Phillips, 357 F.3d at 1240–41. Thus the ALJ may reject the opinion of an examining source when the evidence supports a contrary conclusion. See Sryock v. Heckler, 764 F.2d 834, 835 (11th Cir. 1985). Provided the ALJ articulates specific reasons for refusing to accept the source's opinion and those reasons are supported by substantial evidence, there is no reversible error. Moore v. Barnhart, 405 F.3d 1208, 1212 (11th Cir. 2005). Accordingly, in this case, while Dr. Law's opinion may have been due some weight, the ALJ was not required to give it controlling weight. Moreover, the ALJ was entitled to discount Dr. Law's opinion as long as he gave specific reasons, supported by the record, for declining to accept the opinion. As to the opinion of a one-time examiner, such as Dr. Law, versus the opinion of a non-examining consultant, such as Dr. Lewis, both types of opinions are weighed under the same factors used to assess the opinions of treating sources; these factors include supportability, consistency, and specialization. See 20 C.F.R. § 404.1527(d) (f). The Commissioner generally, however, will give more weight to the opinion of a source who has

examined a claimant than to the opinion of a source who has not, *see* 20 C.F.R. § 404.1527(d) (1), although the Commissioner is required to consider evidence from non-examining sources as opinion evidence. 20 C.F.R. § 404.1527(f)(1).

The court concludes the reasons given by the ALJ for discounting Dr. Law's opinion that Plaintiff was disabled on June 3, 1985—including that Dr. Law's opinion was not consistent with the medical evidence of record for the relevant period and was not supported by the record—are adequately specific and supported by substantial record evidence.

Plaintiff's Air Force medical records reflect that the transient situational disturbance he experienced in Vietnam in May 1972 had resolved by July 1972 (Tr. 660). Even if Plaintiff's subsequent medical history suggests that this episode was the first manifestation of his later diagnosed, progressively worsening condition of PTSD, in July 1972 Plaintiff was found psychiatrically fit for discharge from the military. Moreover, according to Plaintiff's hearing testimony and earnings records, after leaving the Air Force Plaintiff was able to maintain regular, full-time employment for approximately nine years, or until sometime in 1981 (Tr. 1100; 1334–37; 558). Additionally, the administrative file contains no medical records whatsoever for the period from July 1972 through May 1985, much less records that reflect Plaintiff's complaints or treatment of any psychiatric ailment. Thus Plaintiff's early medical and other history do not provide support for Dr. Law's opinion that Plaintiff was disabled on June 3, 1985, based on his mental impairments, or for a finding that Plaintiff became disabled prior to December 31, 1986. Additionally, and significantly, Plaintiff's hospitalization on June 3, 1985, was for treatment of a high fever and a skin condition, not a psychiatric condition (Tr. 193–205). Plaintiff's second hospitalization in June 1985 likewise was not related to a psychiatric condition but rather was for surgical treatment of his gynecomastia (Tr. 206–13). Indeed, Plaintiff's reported mental status in late June 1985 apparently was unremarkable (Tr. 211). Plaintiff has not pointed to any entries related to his June 1985 hospitalizations or any other medical records for 1985 which mention psychiatric complaints or treatment, and the court is aware of none.

Plaintiff's medical records for 1986 also are inadequate to support Dr. Law's opinion that Plaintiff was disabled on June 3, 1985, or a conclusion that Plaintiff became disabled by December 31, 1986. The record evidence reflects that in June 1986, when Plaintiff presented for a mass in the

right breast and a rash, he also reported chronic problems with his "nerves" (by which, the record suggests, he likely meant anxiety) (Tr. 588–89). Shortly thereafter, in July 1986, Dr. O'Connell examined Plaintiff for the first time and administered the MMPI (Tr. 273–77). Despite expressing a concern about the validity of the results due to the nature of some of Plaintiff's responses, Dr. O'Connell concluded that the MMPI reflected a profile essentially within normal limits (Tr. 271). Dr. O'Connell diagnosed Plaintiff as having, *inter alia*, adjustment disorder with anxious mood and possible PTSD, which he described as chronic and mild (Tr. 269–70). Plaintiff's other treatment and hospitalization records for 1986 refer to his physical impairments, including those related to his diagnosis of and treatment for Graves' disease, but they contain little reference to mental problems. Plaintiff complained of "nerves," or anxiety, in September 1986 (Tr. 574) and October 1986 (Tr. 214; 238), but his anxiety apparently was attributed to the "lack of knowledge concerning diagnosis/treatment" of his thyroid condition (Tr. 241) or to his hyperthyroidism itself (Tr. 229). The medical records of Plaintiff's October 1986 hospitalization do not appear to identify his anxiety as being severe (regardless of whether the anxiety was related to Plaintiff's hyperthyroidism, PTSD, both conditions, or something else), do not reflect that he was specifically treated for anxiety at that time, and do not include anxiety or other mental condition(s) among his discharge diagnoses (Tr. 214). The court therefore concludes that Plaintiff's medical records for 1986, considered together with Plaintiff's earlier medical records, do not support Dr. Law's opinion that Plaintiff was disabled by his mental impairments on June 3, 1985. Plaintiff cites no other medical records for 1986 that mention psychiatric complaints or care, and the court has located none.

Similarly, Plaintiff's records after his DLI on December 31, 1986—both immediately and for many years subsequent—do not provide adequate support for Dr. Law's disability opinion. Plaintiff's VA records from 1987 note his reports of having experienced tension, trembling, and sleep problems since approximately the winter of 1985, which was prior to his Graves' disease diagnosis and ablation treatment. Plaintiff's apparent increased compliance with his thyroid medications following treatment reportedly resulted in improvement, then stabilization, of his anxiety by February 1987 (Tr. 558; 538). Also, Plaintiff's mental status in March 1987 was described as "slightly anxious," with thought processes and affect normal, and Plaintiff reported that he had experienced "little to ∅ psych. sequelae" from his experiences in Vietnam (Tr. 558).

Furthermore, Plaintiff's VA physician stated in a letter dated April 21, 1987, that Plaintiff was being treated for mild anxiety and that when on medication his physical and mental status were within normal limits (Tr. 376). Other records from 1987 either do not mention Plaintiff's psychiatric problems or describe his anxiety disorder as mild or stable (Tr. 550–53; 545).

Additionally, a progress note from February 1988 states that Plaintiff's anxiety, thought to be related to his post-thyroid ablation status, had been stable since February 1987 (Tr. 528). Moreover, nothing in Dr. Love's February 1988 evaluation or Dr. O'Connell's August 1988 reevaluation suggests that Plaintiff's mental condition was disabling at the time his insured status expired on December 31, 1986, or even at the time the assessments were made in 1988: Dr. Love concluded that he could not specify a psychiatric diagnosis (Tr. 366), and Dr. O'Connell concluded Plaintiff suffered from mild adjustment disorder with anxious mood, in fair remission on medication, and possible PTSD, also mild (Tr. 269). The remainder of Plaintiff's VA records for 1988, and for 1989, make little mention of treatment or complaints of psychiatric problems. Plaintiff required increased psychiatric care starting in 1990 as his mental problems worsened, though he often was apparently fairly stable on his medications (Tr. 486; 452–53; 481; 484; 487–88; 439; 631; 628–29; 620; 626–27). In March 1993, as reflected in the evaluation and functional assessment performed by Dr. Zumarraga, Plaintiff exhibited only mild or slight restrictions in his mental functional capacity (Tr. 642–44). By late 1994, however, Plaintiff's mental condition had deteriorated markedly, and he was hospitalized and placed in a PTSD treatment program for three months (Tr. 655–56). In April 1995 Plaintiff was living in his car, before moving into a VA domiciliary (Tr. 828–29; 859). Throughout the remainder of 1995 Plaintiff was treated on numerous occasions for severe psychiatric complaints, including depression, anxiety, anger, and sleep disturbances (*see* Tr. 664–67; 863–79; 882–88; 901–04; 912–21; 927; 946–48; 950–51). There appears to be a void in the record for 1996 and 1997, but Plaintiff's records from 1998 through 2005 likewise reflect that, in addition to receiving treatment for his physical ailments, he was also treated frequently for severe symptoms of PTSD (*see* Tr. 988; 1035; 1111–37; 1195–1247; 1262–93; 1305–23).

The record of Plaintiff's treatment for his mental impairments for the period from 1972 through 2005, summarized above, simply does not provide adequate support for Dr. Law's October

1998 opinion—offered, somewhat equivocally,[15] in 1998—that Plaintiff was disabled by his mental impairments as of the specific date of June 3, 1985, or a finding that Plaintiff became disabled by December 31, 1986, his DLI. The court therefore is persuaded that substantial evidence supports the ALJ's conclusion that Dr. Law's disability opinion was not consistent with the medical evidence of record relevant to the period June 3, 1985, through December 31, 1986, and lacked sufficient documentary support. For the same reasons, the ALJ was entitled to reject what Plaintiff describes as Dr. Crum's corroborating opinion, which suggested functional limitations similar to those identified by Dr. Law. Additionally, although asked to do so, Dr. Crum did not offer an opinion as to the earliest date the same level of severe impairment had existed, much less that it occurred prior to December 31, 1986; rather, he noted simply that Plaintiff's problems related to his Vietnam experiences were "extensive" and "long term" (Tr. 906).

Furthermore, the record supports the ALJ's acceptance of Dr. Lewis' opinion that Plaintiff experienced only "mild to moderate anxiety and depression due in part to worrying about his medical problems along with possible mild PTSD" (Tr. 1139). According to Dr. Lewis, during the period at issue Plaintiff at most had moderate restrictions in mental functioning (Tr. 1141–42). As the ALJ noted, Dr. Lewis' opinion is consistent with the longitudinal, contemporaneously created record of Plaintiff's treatment during the relevant period of June 3, 1985, through December 31, 1986, specifically the June 23, 1986, and July 7, 1986, records (Tr. 1069). Dr. Lewis' opinion is also consistent with other records created within or near the relevant period. These include all of Plaintiff's VA records for 1985, none of which appear to reference psychiatric problems (*see* Tr. 193–213; Tr. 597–613), as well as the entries made in Plaintiff's 1986 VA records in which his reported symptom of nervousness was described as being consistent with his recent diagnosis of hyperthyroidism (Tr. 229) and in which no diagnosis of severe anxiety appears (Tr. 214). Records consistent with Dr. Lewis' opinion also include Plaintiff's 1987 VA records, in particular the March

---

[15]    As outlined above, Dr. Law wrote two letters dated November 12, 1998, to Plaintiff's counsel. The first identified the mid-1980s as a "good (though not perfect) marker for the beginning" of disability (Tr. 1036). The second letter changed that opinion, to state in far more specific and confident terms: "It is my opinion based upon a reasonable degree of psychological certainty, that Mr. Petty's mental impairments reached such a degree of severity that he was unable to meet the mental demands of employment as of June 3, 1985" (Tr. 1040). The court notes, however, that the latter statement is particularly inconsistent with the view, offered in the first paragraph of both letters, that it was "difficult to give a precise onset date or one with a high probability of validity" (Tr. 1036, 1040).

1987 entry noting Plaintiff's report that his anxiety was improved since he had increased his medication compliance (Tr. 558); the observation in March 1987 that Plaintiff's mental status when examined was "slightly anxious" (*id.*); the April 1987 notation that Plaintiff's anxiety was "greatly improved" (Tr. 555); the April 1987 letter from Plaintiff's VA physician describing Plaintiff's anxiety as mild and that, on medication, his mental status was within normal limits (Tr. 376); the lack of any mention of psychiatric complaints in May, June, or July 1987; and the September 1987 treatment note describing Plaintiff's anxiety disorder as mild (Tr. 545).

The ALJ cited two other reasons for discounting the opinions of Dr. Law and Dr. Crum—that they did not identify the documentation on which they relied in reaching their opinions and that each was a one-time examiner—both of which reasons also are adequately supported by the record. Plaintiff argues that, contrary to the ALJ's statement regarding the first of these reasons, the opinions of both Dr. Law and Dr. Crum are based upon the results of psychometric testing each of them administered to Plaintiff and discussed in detail in their reports. While Plaintiff is correct in noting the various objective tests that Dr. Law and Dr. Crum performed at the time of their evaluations, he fails to acknowledge that neither examiner identified tests or other documentation, his own or from other sources, that supports a professional opinion of disability *prior to December 31, 1986*, which is the central and critical issue in this appeal. Plaintiff also complains that the ALJ discounted the opinions of Dr. Crum and the particularly well-qualified Dr. Law on the ground they were one-time examiners but then anomalously credited the opinion of Dr. Lewis, a mere non-examining consultant. The record apparently does not contain Dr. Law's professional qualifications, including any reference to a specialization or other credential involving the treatment of veterans. Regardless, even if Dr. Law possessed such qualifications and even if his opinion therefore should be accorded greater weight, the ALJ was also required to consider the supportability and consistency of the opinions of both examining and non-examining psychologists. *See* 20 C.F.R. § 404.1527(d) (3) (4) (5). As set forth previously, the ALJ properly relied on both a lack of supportability in and consistency with the record to discount the opinions of both Dr. Law and Dr. Crum. Moreover, as noted, Dr. Lewis' opinion is both consistent with and supported by the longitudinal record of Plaintiff's care for the relevant period of June 3, 1985, through December 31, 1986, as well as for the time immediately prior and subsequent to that period. In short, the ALJ did not err by giving the

opinions of the one-time examiners Drs. Law and Crum less weight than he gave that of the non-examining consultant Dr. Lewis.

Plaintiff also argues that the rejected opinions of Dr. Miller, Plaintiff's treating psychiatrist, provide adequate corroboration of Dr. Law's opinion that Plaintiff has been disabled since June 3, 1986. As noted previously, the testimony of a treating physician ordinarily must be given substantial or considerable weight. Phillips, 357 F.3d at 1240. Here, however, the ALJ gave an adequate reason, which the record supports, for declining to do so. As the ALJ pointed out, none of the four functional limitations assessments made by Dr. Miller identify with any specificity the date on which the limitations became severe. In response to this inquiry, Dr. Miller alternately stated that Plaintiff "started receiving treatment for combat PTSD at VA Pensacola in 1990" (Tr. 1103); that "Pt. has had it for years, probably since his return from Viet Nam" (Tr. 1107); that Plaintiff "started coming to the VA in Pensacola for treatment for PTSD in 1990" (Tr. 1190); and that Plaintiff had suffered with the severe limitations described "[s]ince 1990, or earlier" (Tr. 1295). Given the crucial importance in this case of identifying the date with some degree of certainty by which Plaintiff's symptoms of PTSD became disabling (as well as the fact that with respect to each of the four assessments Dr. Miller indicated that no contemporaneous psychological evaluation had been conducted (Tr. 1103; 1107; 1190; 1295)), the ALJ did not err in refusing to accord Dr. Miller's opinions substantial weight.

Finally, the court addresses Plaintiff's contention that an interrogatory posed to Dr. Lewis, which quoted part of the Report and Recommendation adopted by the district court, effectively directed him to provide an answer that discounted the opinion of Dr. Law (Doc. 15 at 20). The court concludes that Dr. Lewis' opinion was not improperly influenced by the phrasing of the interrogatory posed to him. As the Commissioner points out, in responding to the interrogatories Dr. Lewis indicated both that he had reviewed the entire Report and Recommendation and also that there were no conflicts in the record which affected his opinion (see Tr. 1139; 1144–45). Moreover, although Plaintiff's counsel had the opportunity to question Dr. Lewis about any conclusion he might have drawn regarding the court's treatment of Dr. Law's opinion or the ALJ's citation of it, he failed to do so.

VI.     CONCLUSION

As directed by the Appeals Council in its final remand order, the ALJ identified Plaintiff's non-exertional limitations during the relevant period, stating with particularity the level of the limitations' severity during the relevant period of June 3, 1985, through December 31, 1986.  The ALJ also determined that Plaintiff lacked the RFC to return to his past relevant work and obtained testimony from a VE that identified at step five of the sequential analysis jobs Plaintiff could have performed prior to his DLI despite his assessed limitations.  For the reasons outlined above, this court concludes that the ALJ's instant decision denying DIB benefits, which stands as the final decision of the Commissioner, is supported by substantial evidence and thus should not be disturbed. 42 U.S.C. § 405(g); Lewis, 125 F. 3d at 1439; Foote, 67 F.3d at 1560.  Furthermore, Plaintiff has failed to show that the ALJ applied improper legal standards, erred in making his findings, or that any other ground for reversal exists.

Accordingly, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**, that this action be **DISMISSED,** and that the clerk be directed to **CLOSE** the file.

At Pensacola, Florida this 18th day of February 2010.


/s/ *Elizabeth M. Timothy*
**ELIZABETH M. TIMOTHY**
**UNITED STATES MAGISTRATE JUDGE**


### NOTICE TO THE PARTIES

**Any objections to these proposed recommendations must be filed within fourteen (14) days after being served a copy hereof.  Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control.  A copy of any objections shall be served upon any other parties.  Failure to object may limit the scope of appellate review of factual findings.  *See* 28 U.S.C. § 636; United States v. Roberts, 858 F.2d 698, 701 (11th Cir. 1988).**